## ORAL ARGUMENT NOT YET SCHEDULED

## No. 14-1143

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

AIRLINES FOR AMERICA AND
INTERNATIONAL AIR TRANSPORT ASSOCIATION,

*Petitioners*,

v.

TRANSPORTATION SECURITY ADMINISTRATION AND
JOHN S. PISTOLE, ADMINISTRATOR,

*Respondents*.

_____

**On Petition for Review from the
Transportation Security Administration, Docket No. TSA-2001-11120**

_____

### OPENING BRIEF FOR PETITIONERS
_____

DAVID A. BERG
AIRLINES FOR AMERICA
1301 Pennsylvania Avenue, NW
Suite 1100
Washington, DC 20004
(202) 626-4000


JEFFREY N. SHANE
INTERNATIONAL AIR
TRANSPORT ASSOCIATION
800 Place Victoria, P.O. Box 113
Montreal, QC H4Z 1M1
Canada

PAUL D. CLEMENT
JEFFREY M. HARRIS
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Petitioners*

September 26, 2014

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners hereby provide this certificate as to parties, rulings, and related cases, which includes the disclosure required by Circuit Rule 26.1.

### A.    Parties and *Amici*

Petitioners are Air Transport Association of American, Inc., d.b.a. Airlines for America ("A4A"), and the International Air Transport Association ("IATA"), each acting in a representative capacity on behalf of its members. Founded in 1936, A4A is the principal trade and service organization of the U.S. scheduled airline industry, and its member airlines and their affiliates transport more than 90 percent of all U.S. airline passenger and cargo traffic. A4A's members are Alaska Airlines, Inc.; American Airlines, Inc.; Atlas Air, Inc.; Delta Air Lines, Inc.; Federal Express Corporation; Hawaiian Airlines, Inc.; JetBlue Airways Corp.; Southwest Airlines Co.; United Continental Holdings, Inc.; United Parcel Service Co.; and US Airways, Inc. A4A is a District of Columbia Corporation with its principal place of business in the District of Columbia. A4A has no parent corporation, does not issue stock, and no publicly held company controls more than 10% of A4A. The fundamental purpose of A4A is to foster a business and regulatory environment that ensures safe and secure air transportation and enables U.S. airlines to flourish, stimulating economic growth locally, nationally, and internationally.

IATA is a nongovernmental international trade association founded in 1945 by air carriers engaged in international air services. IATA consists of 240 member airlines from 118 countries, representing 84% of the world's total air traffic. IATA strives to represent, lead, and serve the airline industry by advocating the interests of airlines across the globe, developing global commerce standards for the airline industry, and assisting airlines in operating safely, securely, efficiently, and economically. IATA has no parent corporation, does not issue stock, and no publicly held corporation controls more than 10% of IATA.

Respondents are the Transportation Security Administration ("TSA") and John S. Pistole, Administrator.

No other entities have sought to participate as intervenors or *amici curiae* in this case.

### B.    Rulings Under Review

Petitioners seek review of an Interim Final Rule ("Rule") that was promulgated by the Transportation Security Administration on June 20, 2014, in Docket Number TSA-2001-11120. *See* Interim Final Rule, *Adjustment of Passenger Civil Aviation Security Service Fee*, 79 Fed. Reg. 35,462 (June 20, 2014).

### C.    Related Cases

This matter has not previously been before this Court or any other court.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............... i

TABLE OF AUTHORITIES...................................................................... v

GLOSSARY OF ABBREVIATIONS ................................................... viii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATUTES AND REGULATIONS ....................................................... 4

STATEMENT OF THE ISSUES .......................................................... 4

STATEMENT OF THE CASE............................................................... 4

    A.    The Aviation and Transportation Security Act .................................. 4

    B.    The Bipartisan Budget Act of 2013..................................... 7

    C.    TSA's Interim Final Rule................................................... 9

SUMMARY OF ARGUMENT............................................................ 13

STANDARD OF REVIEW ................................................................ 18

ARGUMENT ................................................................................... 19

I.    TSA's Imposition Of Security Fees On One-Way Trips That Originate In Foreign Countries Is Contrary To The Clear Text And Purpose Of The Statute. ............................................... 19

    A.    The Unambiguous Text and Purpose of the Budget Act Amendments Make Clear That TSA May Not Impose a Fee on the Domestic Leg of One-Way Trips That Originate in Foreign Countries. ............................................................ 20

    B.    TSA's Brief Defense of its Imposition of Fees on Domestic Segments of One-way Trips Originating Abroad Does Not Withstand Scrutiny. ........................................................... 24

II.    TSA's Elimination Of The Round-Trip Cap On Security Fees Is
       Arbitrary, Capricious, And Contrary To Law. .............................................. 30

       A.    Congress Unquestionably Intended To Retain the Round-Trip
             Cap on Security Fees. ........................................................................... 31

       B.    TSA's Reasons for Eliminating the Round-Trip Cap
             Disregard Clear Congressional Intent and Are Wholly
             Without Merit. ...................................................................................... 35

CONCLUSION ..................................................................................................... 39

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Cases**

*Alaska Airlines, Inc. v. Transp. Sec. Admin.*,
  588 F.3d 1116 (D.C. Cir. 2009)...........................................................................17

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998).............................................................................................18

*American Petroleum Inst. v. EPA*,
  52 F.3d 1113 (D.C. Cir. 1995).............................................................................26

*Bond v. U.S.*,
  134 S.Ct. 2077 (2014)..........................................................................................36

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979).............................................................................................36

*City of Arlington, Tex. v. FCC*,
  133 S. Ct. 1863 (2013).........................................................................................18

*Clifford F. MacEvoy Co. v. United States*,
  322 U.S. 102 (1944).............................................................................................26

*EEOC v. Arabian American Oil Co.*,
  499 U.S. 244 (1991).............................................................................................36

*Ginsberg & Sons v. Popkin*,
  285 U.S. 204 (1932)...................................................................................... 15, 26

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*,
  706 F.3d 499 (D.C. Cir. 2013) ............................................................................18

*Livadas v. Bradshaw*,
  512 U.S. 107 (1994).............................................................................................36

*Miller v. Clinton*,
  687 F.3d 1332 (D.C. Cir. 2012) ..........................................................................18

---

[*] Authorities on which this brief chiefly relies are marked with an asterisk.

*Nat'l Archives & Records Admin. v. Favish*,
541 U.S. 157 (2004) ...............................................................................36

*NLRB v. United Food & Commercial Workers Union,*
*Local 23, AFL-CIO*, 484 U.S. 112 (1987) .........................................18

*NRDC v. Reilly*,
976 F.2d 36 (D.C. Cir. 1992) ...............................................................26

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) .............................................................17

*RadLAX Gateway Hotel v. Amalgamated Bank*,
132 S. Ct. 2065 (2012).........................................................................26

*United States v. Texas*,
507 U.S. 529 (1993)..............................................................................36

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
515 U.S. 528 (1995)..............................................................................36

*Whitman v. American Trucking Ass'n*,
531 U.S. 457 (2001)..............................................................................37

**Statutes**

5 U.S.C. § 702 ..................................................................................3, 17

*49 U.S.C. § 44940........................................... 1, 10, 13, 15, 19, 20, 22, 25, 30, 37

*49 U.S.C. § 44940 (2009) ................................................. 4, 5, 14, 20, 30

49 U.S.C. § 46110 .................................................................................3

Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat.
597 (2001) ...........................................................................................4

**Regulations**

49 C.F.R. § 1510.3 (2011)...................................................................5

49 C.F.R. § 1510.5 (2011)......................................................... 2, 5, 20

49 C.F.R. § 1510.7 ...............................................................................3

**Other Authorities**

H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget Act of
2013, (Comm. Print Feb. 2014) ................................................. 7, 8, 16, 22, 31, 36

H.R. 5462, 113th Cong. 2d Sess.
(passed Sept. 17, 2014) ........................................................................................34

Montreal Convention 1999, Chapter 1, Article 1,
*available at* http://www.iata.org/policy/Documents/MC99_en.pdf ...................22

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| A4A | Airlines for America |
| Budget Act | Bipartisan Budget Act, Pub. L. No. 113-67, 127 Stat. 1165, § 601 (2013) |
| IATA | International Air Transport Association |
| TSA | Transportation Security Administration |

## INTRODUCTION

In the Bipartisan Budget Act of 2013 ("Budget Act"), Congress acted to simplify administration of the "September 11th Security Fee," which is paid by air passengers to offset the costs of aviation security services. The original version of the statute, enacted in 2001, was based on enplanements: passengers were assessed a $2.50 fee based on each *enplanement* at an airport in the United States. In practice, this meant that passengers paid twice the fees for a one-stop flight ($5.00) as they would for a non-stop flight between the same two cities ($2.50). But the 2013 amendments eliminated the focus on enplanements in favor of a more straightforward focus on one-way trips. The statute now assesses a $5.60 fee on each "*one-way trip* in air transportation or intrastate air transportation *that originates at an airport in the United States*." 49 U.S.C. § 44940(c) (emphasis added).

This petition challenges an Interim Final Rule promulgated by the Transportation Security Administration ("TSA") on June 20, 2014, that purports to "implement" the 2013 amendments to the security fee statute. In reality, the Interim Final Rule defies statutory text and congressional intent in ways that frustrate the objectives of the 2013 amendments. Two aspects of the Interim Final Rule are at issue in this appeal.

*First*, even though the amended statute quite clearly limits security fees to "one-way trip[s] … that originate[] at an airport in the United States," TSA

announced in the Interim Final Rule that it would assess fees on one-way trips that originate in *foreign countries*, if they also feature a domestic enplanement. For example, if a one-way trip begins in a foreign country but includes a tail-end connecting flight in the United States—such as a London-to-New York-to-Chicago trip—TSA will assess a security fee on the final flight segment. Thus two passengers whose one-way trips both start on the same flight originating in London will be treated differently based on one having a domestic enplanement as part of the one-way trip originating in London. TSA largely ignored the text of 49 U.S.C. § 44940(c)—which abandons the focus on enplanements and is specifically designed to *limit* the circumstances in which fees will be assessed—and the express congressional purpose of simplifying application of the fee. Instead, TSA sought to justify its action by pointing to another provision of the statute, section 44940(a)(1), which provides TSA general authority to impose uniform fees on passengers "in air transportation and intrastate air transportation originating at airports in the United States."

*Second*, TSA's Interim Final Rule eliminates the longstanding "round-trip cap" on fees, which had provided that passengers would be assessed no more than two security fees on a one-way trip or four fees on a round-trip itinerary. *See* 49 C.F.R. § 1510.5 (2011). Absolutely nothing in the 2013 amendments suggested that Congress intended to eliminate the round-trip cap and, indeed, the drafters of the

relevant language in both the House and the Senate stated in no uncertain terms that they intended for the cap to be retained.  Yet TSA nonetheless claimed in the Interim Final Rule that a "plain language" reading of the 2013 amendments justified elimination of the round-trip cap.

## JURISDICTIONAL STATEMENT

TSA promulgated the Interim Final Rule on June 20, 2014.  *See* Interim Final Rule*, Adjustment of Passenger Civil Aviation Security Service Fee*, 79 Fed. Reg. 35,462 (June 20, 2014) (JA 48-60).  A4A and IATA filed a timely petition for review in this Court on July 30, 2014.  This Court has jurisdiction under 49 U.S.C. § 46110(a), which provides that a person "disclosing a substantial interest in an order issued by the [Administrator]" may seek review in this Court.

Petitioners have standing under Article III and 49 U.S.C. § 46110 because their members are domestic and international passenger airlines that will incur significant injury as a result of TSA's Interim Final Rule.  Petitioners' member airlines are directly impacted by the Interim Final Rule because they are responsible for implementing, collecting, and remitting the security fees that are the subject of the Rule, and can be penalized for incorrectly applying the fee.  Petitioners' members must also include the challenged fees in their advertised air transportation prices.  *See* 49 C.F.R. § 1510.7.  For all of these reasons, Petitioners and their member

airlines "disclos[e] a substantial interest" in the agency action at issue here.  49

U.S.C. § 46110; *see* 5 U.S.C. § 702-706.

## STATUTES AND REGULATIONS

The relevant provisions of the Bipartisan Budget Act of 2013, Pub. L. No.

113-67, 127 Stat. 1165, § 601, the Aviation and Transportation Security Act of 2001,

Pub. L. No. 107-71, 115 Stat. 597, 49 U.S.C. § 44940 (2001), and TSA's regulations,

49 C.F.R. §§ 1510.3, 1510.5 (2011), are reproduced in the Addendum to this brief.

## STATEMENT OF THE ISSUES

1.    Whether TSA's decision to impose passenger security fees on the

domestic leg of one-way trips that originate outside the United States is arbitrary,

capricious, or contrary to law.

2.    Whether TSA's decision to eliminate the round-trip cap on aviation

passenger security fees is arbitrary, capricious, or contrary to law.

## STATEMENT OF THE CASE

### A.    The Aviation and Transportation Security Act

Pursuant to the Aviation and Transportation Security Act, Pub. L. No. 107-71,

115 Stat. 597 (2001), TSA imposed a fee on airline passengers to offset part of the

costs of providing aviation security services.  The statute directed TSA to "impose a

uniform fee, on passengers of air carriers and foreign air carriers in air transportation

and intrastate air transportation originating at airports in the United States."  49

U.S.C. § 44940(a)(1) (2009).  As originally enacted in 2001, the statute focused on

4

enplanements.  It authorized fees on a *per-enplanement* basis, providing that such fees "may not exceed $2.50 per enplanement in air transportation or intrastate air transportation that originates at an airport in the United States."  49 U.S.C. § 44940(c) (2009).  The statute further provided that "the total amount of such fees may not exceed $5.00 per one-way trip."  *Id.*  TSA began collecting the fee on February 1, 2002.  *See Imposition and Collection of Passenger Civil Aviation Security Service Fees*, 66 Fed. Reg. 67,698-01 (Dec. 31, 2001) (JA 5-10).

TSA set the fee at the maximum $2.50 per "passenger enplanement," defined as "a person boarding in the United States in scheduled or nonscheduled service on aircraft in intrastate, interstate, or foreign air transportation."  49 C.F.R. § 1510.3 (2011).  For in-bound trips from a foreign country to the United States, passengers were not subject to the fee for "flight segment[s] outside of the United States" or for merely landing and deplaning at a United States destination.  *Id*. § 1510.5.  But when a foreign-originating trip included a connecting flight segment within the United States, TSA collected the fee on the domestic-connecting flight because it involved an "enplanement … that originates at an airport in the United States."  49 U.S.C. § 44940(c) (2009).

In order to implement the statute's $5.00-per-one-way-trip maximum fee requirement, TSA also limited application of the fee to no more than "two enplanements per one-way trip or four enplanements per round trip," thus capping

5

the fee at $5.00 per one-way trip and $10.00 per round-trip. 49 C.F.R. § 1510.5 (2011). Accordingly, a passenger taking a non-stop one-way flight between New York and Los Angeles would pay a total of $2.50, while a passenger with one or more connecting flights on their one-way trip between the same two cities would pay $5.00. And a passenger with a round-trip itinerary that originated and terminated at the same location would pay no more than $10.00 in security fees, no matter the number of enplanements included in the itinerary.

In response to concerns raised by air carriers, TSA subsequently clarified how the fee would apply when there were multiple one-way trips on the same itinerary. *See* Letter from Michael Gambone, Acting Director, Office of Revenue (Oct. 24, 2006) (JA 25-28). TSA defined "one-way trip" to mean "continuous travel from a point to another point during which a stopover does not occur." *Id*. at 1-2 (JA 25-26). A "stopover" was defined to mean "a break in travel of more than (1) four hours between two domestic flights; or (2) 12 hours between a domestic and an international flight or between two international flights." *Id*. at 2 (JA 26). TSA also defined "round trip" as "a trip on an air travel itinerary that terminates or has a stopover at the point of origin (or co-terminal)." *Id*. TSA has used these definitions in its imposition of the fee since 2002. *See* 79 Fed. Reg. at 35,463-64 (JA 50-51).

6

### B.     The Bipartisan Budget Act of 2013

Against the backdrop of this established regulatory structure, Section 601 of the Bipartisan Budget Act of 2013 ("Budget Act") made carefully targeted changes to the statute designed to "simplif[y] the fee structure."  H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget Act of 2013, at 18 (Comm. Print Feb. 2014) (Add. 8a).  In particular, the Budget Act shifted the basis for imposing the fee from *enplanements* to *one-way trips*, establishing "a flat, $5.60 fee per one-way trip, regardless of the number of enplanements."  *Id*.  Section 44940(c), as amended, now provides that "[f]ees imposed under subsection (a)(1) shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States."  49 U.S.C. § 44940(c).  Thus, under the Budget Act, passengers taking a one-way trip from New York to Los Angeles will pay the same $5.60 fee whether they have a non-stop or multiple-stop itinerary.  More broadly, Congress shifted the focus of the fees from a per-enplanement approach to one that focused on one-way trips.  Accordingly, there is a uniform $5.60 fee on all one-way trips that originate in the United States.

In imposing the new limitation of $5.60 per one-way trip, Congress presupposed the continued existence of long-standing limitations on the fee, most notably the round-trip cap.  Indeed, since the round-trip cap arose directly from the statute's prior one-way trip cap, Congress had no reason to think that a move from a

7

$5.00 one-way cap to a simpler $5.60 one-way fee would do anything to eliminate the round-trip cap.  Rather, through targeted amendments to the statute made against the backdrop of the existing round-trip cap, Congress' move from a $5.00 one-way cap to a $5.60 one-way fee was clearly intended to limit the fee to no more than two one-way trips per round-trip itinerary (or $11.20 per round-trip).  *See* H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget Act of 2013, at 18 (Comm. Print Feb. 2014) (Add. 8a) (intention was to "simplif[y] the fee structure to a flat, $5.60 fee per one-way trip, regardless of the number of enplanements").

The drafters of the Budget Act in both the House and Senate subsequently confirmed that nothing in the legislation was intended to change the existing round-trip cap.  Congressman Paul Ryan and Senator Patty Murray emphasized that "[a]s the authors of this legislation in the House and Senate, our intent in drafting this provision was to help the federal government recover a greater share of TSA's operating costs, consistent with the manner in which the fee had operated previously, i.e. with a cap on a round-trip that was twice the maximum one-way fee."  Letter from Congressman Paul Ryan and Senator Patty Murray to John Pistole, Administrator, TSA (May 6, 2014) (JA 31).  "In drafting the [Budget Act]," the authors stated, they "indicate[d] a desire to simplify the administration of the fee" and "inten[ded] … to retain an overall roundtrip fee cap."  Letter from Congressman Paul Ryan and Senator Patty Murray to Director Sylvia Burwell, OMB (May 30,

2014) (JA 41-42); *see also* Letter from John A. Boehner to Jeh Johnson (May 20, 2014) (JA 37) (legislative intent was to "simplify[] the administration of air transportation fees without changing the overall cap for the fees"); Letter from Chairmen and Ranking Members of the House Committee on Homeland Security to Acting Director Brian Deese, OMB (June 16, 2014) (JA 46) (legislative intent was to "simplify the fee assessment and logically cap the fee for a round trip at twice that of a one-way trip (i.e. $11.20), as has been TSA's long-held policy"); Letter from Senator John D. Rockefeller, Chairman, Committee on Commerce, Science, and Transportation, to Acting Director Brian Deese, OMB (June 9, 2014) (JA 43) (legislative intent was to "retain the round-trip cap on TSA fees for air travelers").

### C.    TSA's Interim Final Rule

On June 20, 2014, TSA promulgated an Interim Final Rule that purports to "implement" the statutory changes made by Congress in the Budget Act.  *See* 79 Fed. Reg. at 35,464 (JA 51).  The Rule acknowledges that the Budget Act "simplifies the structure" of the security fee by "requiring that the fee be imposed on a one-way trip basis rather than a per-enplanement basis."  *Id.*  Whereas "the original amount of the fee was calculated in terms of the number of enplanements in air transportation or intrastate air transportation originating at airports in the United States, under the Budget Act amendments, the restructured fee is based on each one-way trip."  *Id*. Consistent with that statutory purpose, the Rule eliminates the definition of

"passenger enplanement" because the concept of "enplanements" is "no longer relevant to imposition of the fee." *Id.*; *see id*. at 35,465 (JA 52) ("remov[ing] references to enplanements, as required under section 601 of the Budget Act").

TSA made only minor terminological changes to the definition of the newly all-important one-way trip, continuing to define "one-way trip" as "continuous air transportation, during which a stopover does not occur." 79 Fed. Reg. at 35,464-65 (JA 51-52). Under that definition, a new one-way trip begins only when a "stopover" occurs, and "each stopover triggers a separate one-way trip." *Id.* at 35,467 (JA 54). The regulation continues to provide that "a break in travel of more than four hours will be required before a stopover would occur (thus triggering a new one-way trip) for continental interstate or intrastate air transportation" and a "break in travel of more than 12 hours will be required before a stopover would occur (thus triggering a new one-way trip) for foreign air transportation." *Id.* at 35,465 (JA 52). In short, a "one-way trip" is continuous air travel that does not involve a break of more than four hours for a domestic flight or more than twelve hours for an international flight (or a flight to or from Alaska or Hawaii).

By its plain terms, the statute now provides that a $5.60 fee may be imposed on each "one-way trip in air transportation or intrastate air transportation *that originates at an airport in the United States*." 49 U.S.C. § 44940(c) (emphasis added). Despite that seemingly clear language, and the clear regulatory definition

10

of one-way trips, however, TSA stated in the Rule that it would continue to assess fees on the domestic, tail-end segments of one-way flights that originate *in foreign countries*.  *See* 79 Fed. Reg. at 35,466 at Table 1, Examples 6 (Paris to New York) and 7 (Frankfurt to Chicago) (JA 53); *see also* TSA, *Imposition of the September 11th Security Fee* (March 28, 2014), Examples 8 & 9 (JA 29-30).  The Rule states that "[a]s with the current regulations, imposition of the fee is applicable to air transportation originating at an airport in the United States, *regardless of where the passenger began his or her travel*."  79 Fed. Reg. at 35,465 (JA 52) (emphasis added).

TSA noted that, under the preexisting regulations, "[a] fee of $2.50 is imposed for a Paris-New York-Chicago itinerary" because that itinerary includes "one enplanement in air transportation originating in the United States [at New York]."  *Id.*  Under the revised regulations, TSA will continue to collect a fee for the final New York-to-Chicago segment even though the *one-way trip* originates in Paris, not New York.  *Id.*  TSA asserted that it had statutory authority to impose this fee because the itinerary contains "air transportation originating at an airport in the United States."  *Id.*

TSA thus claims that it retains authority to impose a fee on domestic enplanements that are part of a one-way trip originating abroad—even in the absence of a stopover triggering a new one-way trip—as it did under the enplanement-

11

focused approach that held sway before the Budget Act amendments, *i.e.*, "since the current regulations took effect in 2002." *Id*. The Rule offers little reasoning in support of that position, other than to note that "[t]o the extent any underlying ambiguity exists in the limitation provision, it is clarified in the context of TSA's authority under 49 U.S.C. § 44940(a)(1), which mandates TSA to impose a fee for passengers 'in air transportation and intrastate air transportation originating at airports in the United States' with no distinction between segments and trips." *Id*. TSA further noted that there is "no indication" that Congress sought in the Budget Act to treat domestic and international itineraries differently, and that TSA's interpretation "better aligns the imposition of the fee with those who benefit from the security services provided for air transportation." *Id*.

The Interim Final Rule also eliminates the cap on the number of times a fee can be imposed on a round-trip itinerary. *See id*. at 35,466 (JA 53) (noting that the Rule "does not include a limit on the number of one-way trips that can be charged per itinerary"). TSA concluded that the round-trip cap must be discarded because no statutory language explicitly authorizes that cap. *See id*. (noting "absence of statutory language authorizing such a cap"). Moreover, TSA reasoned that retaining the round-trip cap under the revised fee structure could result in "disparate treatment for substantially similar travel," as a round-trip booked on one itinerary would benefit from the cap, whereas a different passenger with the same flights who did

12

not book the travel as part of single round-trip itinerary would not. *Id*. According to TSA, eliminating the cap was therefore "consistent with the authorizing language of section 44940(a) and [its] requirement to impose a 'uniform fee.'" *Id*.

A4A and IATA filed a petition for review in this Court on July 30, 2014, challenging TSA's disregard of statutory text and clear congressional intent in improperly increasing fees for airline passengers by: (1) imposing the fee on the domestic, tail-end segments of one-way trips that originate in foreign countries; and (2) eliminating the longstanding round-trip cap on the fee. On August 27, 2014, this Court granted Petitioners' motion for an expedited briefing and argument schedule.

## SUMMARY OF ARGUMENT

Although TSA's Interim Final Rule purports to "implement" the recent amendments to the security fee statute, in reality two provisions of that Rule are wholly unmoored from the narrow and carefully targeted statutory changes made by Congress in the Budget Act.

*First*, TSA has flouted the plain language and express purpose of the statute by imposing fees on some one-way trips that originate outside the United States, namely those one-way trips that originate abroad but have a connecting flight within the United States. The Budget Act authorizes TSA to impose security fees only on "*one-way trip*[*s*] in air transportation or intrastate air transportation *that originate[]*

13

*at an airport in the United States*." 49 U.S.C. 44940(c) (emphasis added). That unambiguous statutory text should end the matter.

The Budget Act changed the focus of the fee regime from enplanements to one-way trips. Thus, under the unambiguous text of the statute, what matters is whether the "one-way trip"—not just a particular flight segment—"originates at an airport in the United States." If the one-way trip does not originate in the United States, fees are not applicable. Yet TSA ignores this explicit statutory limitation and seeks to impose the fee on the second segment of one-way trips that begin in *foreign countries—i.e.*, one-way trips that plainly do not "originate[] at an airport in the United States."

TSA's effort to impose a security fee on that segment of a one-way trip originating abroad would have been sensible under the original version of the security fee statute, which focused on enplanements and imposed a (much smaller) fee on each "enplanement … at an airport in the United States." 49 U.S.C. § 44940(c) (2009). But it cannot survive Congress' shift in focus from enplanements to one-way trips and the Budget Act's limitation of fees to one-way trips originating in the United States. TSA's interpretation of the statute also directly undermines Congress' express goal of creating a simple and uniform fee regime. Rather than treating all one-way trips alike, as Congress plainly intended, TSA instead adopted

rules that treat one-way trips differently based on the happenstance of whether the passenger's itinerary includes a connecting flight.

TSA's brief attempt to justify its counter-textual interpretation of the statute does not withstand scrutiny. TSA does not offer any theory as to how a London-New York-Chicago itinerary is a one-way trip that originates any place other than London or is somehow two one-way trips, one originating in London and another in New York. To the contrary, TSA's regulatory definition of "one-way trip" makes clear there is a single one-way trip that originates in London. *See* 79 Fed. Reg. at 35,464-65 (JA 51-52) ("one-way trip" means "continuous air transportation, during which a stopover does not occur").

Instead of analyzing the text and purpose of the provision directly at issue, TSA claims that its interpretation is permissible because *another* provision of the statute grants TSA authority to assess "uniform" fees on "air transportation and intrastate air transportation originating at airports in the United States." 49 U.S.C. § 44940(a)(1). But that general grant of authority must be construed in light of the far-more-specific (and more-recent) language of section 44940(c). The latter provision—which is entitled "LIMITATION ON FEE"—states in no uncertain terms that TSA may impose a security fee only on "one-way trip[s] in air transportation or intrastate air transportation that originate[] at an airport in the United States." 49 U.S.C. § 44940(c). It is a hornbook principle of statutory interpretation that

15

"[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932). TSA thus cannot point to its general grant of authority in section 44940(a)(1) to evade the specific "LIMITATION[S] ON [THE] FEE" in section 44940(c). Under the plain terms of the statute, the relevant taxable event is limited to a *one-way trip* that originates in the United States, not each and every enplanement that qualifies as "air transportation."

*Second*, TSA has flouted manifest congressional intent by eliminating the longstanding round-trip cap on the security fee. When Congress simplified administration of the fee in the Budget Act, it made very specific and targeted changes that presupposed the ongoing existence of the round-trip cap. The drafters' intention, stated on the record, was to "simplif[y] the fee structure to a flat, $5.60 fee per one-way trip, regardless of the number of enplanements." H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget Act of 2013, at 18 (Comm. Print Feb. 2014) (Add. 8a).

There is no evidence whatsoever that Congress intended to modify or eliminate the longstanding round-trip cap. To the contrary, the round-trip cap flowed directly from Congress' earlier decision to cap the fees on a one-way trip to $5.00. When Congress simplified matters by moving from a per-enplanement fee subject a

16

$5.00 one-way cap to a $5.60 one-way fee, it clearly envisioned no impact on the round-trip cap beyond moving it up from $10.00 to $11.20.  Indeed, the authors of the Budget Act amendment have made their intention to preserve the cap crystal clear, stating that "Congressional intent … was to retain an overall roundtrip fee cap."  Letter from Congressman Paul Ryan and Senator Patty Murray to Director Sylvia Burwell, OMB (May 30, 2014) (JA 42).  And retention of the overall cap on fees would advance Congress' goal of ensuring that the fee is applied in a uniform and straightforward manner, not applied so that certain itineraries that begin and end in the same city are actually treated as three or more one-way trips.

TSA's interpretation is thus contrary to any realistic assessment of Congress' carefully tailored amendments and established rules of statutory construction.  TSA purports to rely on a plain-text reading of the statute, noting the absence of explicit statutory language authorizing a round-trip cap.  But the round-trip cap was based directly on the statutory one-way cap, which Congress modified (by simplifying it into a uniform one-way fee) but did not eliminate.  TSA's blinkered view cannot be squared with the established rule of statutory interpretation that Congress is presumed to legislate against the backdrop of existing law.  That presumption is especially warranted here, where Congress has made plain exactly what it sought to accomplish, and its objective assumed the continued existence of the round-trip cap.

## STANDARD OF REVIEW

TSA's rule must be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Alaska Airlines, Inc. v. Transp. Sec. Admin.*, 588 F.3d 1116, 1120 (D.C. Cir. 2009) (TSA's findings with respect to nonfactual matters reviewed under APA standards); *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 196 (D.C. Cir. 1993) (same). "On a pure question of statutory construction, [a court's] first job is to try to determine congressional intent, using 'traditional tools of statutory construction.'  If [the Court] can do so, then that interpretation must be given effect, and the regulations at issue must be fully consistent with it."  *NLRB v. United Food & Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 123 (1987); *see City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868 (2013) ("applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'").

"[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868 (2013).  "The ambiguity must be such as to make it appear that Congress either

explicitly or implicitly delegated authority to cure that ambiguity." *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 504 (D.C. Cir. 2013).  An agency's interpretation will be upheld only so "long as it is reasonable," *Miller v. Clinton*, 687 F.3d 1332, 1340 (D.C. Cir. 2012), and its "explication" of its reasoning "is not inadequate, irrational or arbitrary," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 364 (1998).

## ARGUMENT

I.   **TSA's Imposition Of Security Fees On One-Way Trips That Originate In Foreign Countries Is Contrary To The Clear Text And Purpose Of The Statute.**

The Budget Act authorizes TSA to impose a security fee only on "*one-way trip*[*s*] in air transportation or intrastate air transportation *that originate*[] *at an airport in the United States*." 49 U.S.C. § 44940(c) (emphasis added).  Yet TSA now seeks to impose security fees on one-way trips that emphatically do not "originate[] at an airport in the United States."  The Interim Final Rule provides that a fee will be assessed on each itinerary that includes an *enplanement* in the United States, "regardless of where the passenger began his or her travel." 79 Fed. Reg. at 35,465 (JA 52).  That interpretation is foreclosed by the unambiguous terms of the statute.  Under any plausible interpretation of the statutory text, a one-way trip that begins in a foreign country does not "originate[] at an airport in the United States," regardless of whether it includes an enplanement in the United States.

**A.     The Unambiguous Text and Purpose of the Budget Act Amendments Make Clear That TSA May Not Impose a Fee on the Domestic Leg of One-Way Trips That Originate in Foreign Countries.**

**1.**  The original version of the security fee statute, enacted in 2001, provided that fees would be imposed on a per-enplanement basis.  The statute expressly authorized a fee for each "*enplanement* in air transportation or intrastate air transportation *that originates at an airport in the United States*."  49 U.S.C. § 44940(c) (2009) (emphasis added).  Under that enplanement-based approach, what mattered was where the particular flight segment or enplanement originated, and *not* where the one-way trip originated.  That is, passengers could be assessed a fee for each "enplanement … at an airport in the United States," even if the enplanement in question was a connecting flight on a trip that originated in a foreign country.

For example, if a passenger flew from London to Chicago via New York, TSA could impose a fee on the New York-to-Chicago leg of the trip because the connecting flight was an "enplanement" in the United States.  *See, e.g.*, TSA, *Imposition of the September 11th Security Fee* (March 28, 2014), Example 8, Current Regulation Structure (JA 30).  The statute applied by its plain terms "per enplanement," not "per one-way trip," and it was sufficient that a "flight segment[] originat[e] at an airport in the United States."  49 C.F.R. § 1510.5 (2011).

After the 2013 Budget Act, however, enplanements are no longer the relevant concept in assessing security fees.  *See* 79 Fed. Reg. at 35,464 (JA 51) (conceding

20

that concept of "enplanements" is "no longer relevant to imposition of the fee"). Instead, the focus has shifted to one-way trips. The statute now provides that "[f]ees imposed under subsection (a)(1) shall be $5.60 *per one-way trip* in air transportation or intrastate air transportation *that originates at an airport in the United States*." 49 U.S.C. § 44940(c) (emphasis added). Thus, the fact that a passenger merely enplanes –*i.e.*, boards a flight—in the United States is no longer sufficient to trigger application of the fee. What matters is whether the passenger's "one-way trip … originates at an airport in the United States."

TSA has long defined a "one-way trip" as continuous air travel during which a "stopover" does not occur, *see* Letter from Michael Gambone, Acting Director, Office of Revenue (Oct. 24, 2006) (JA 25-26), and TSA continued to adhere to that definition in the Interim Final Rule. *See* 79 Fed. Reg. at 35,464-65 (JA 51-52) (defining "one-way trip" as "continuous air transportation, during which a stopover does not occur"). "Stopover," in turn, is defined as a break in travel of more than four hours for a domestic flight or twelve hours for an international flight. *Id.* at 35,465 (JA 52).

Thus, under TSA's own longstanding regulations, a trip that begins in a foreign country, has a break in travel of less than 12 hours, and then has a final connecting flight within the United States is a "one-way trip" that originates in a foreign country. For example, the London-to-New York-to-Chicago trip is unquestionably a one-way

21

trip that originates in London.  It is not two one-way trips, or a one-way trip

originating in London for those traveling to New York and originating in New York

for the others.[1]  Because that one-way trip originates in London and does not

"originate[] at an airport in the United States," it is not subject to a security fee under

49 U.S.C. § 44940(c), even though the enplanement in New York would have been

sufficient to impose a fee under the *ancien regime*.

    **2.**  The legislative history of the 2013 amendments further confirms that

Congress did not intend for fees to apply to *any* portion of one-way trips originating

abroad.  The express purpose of the Budget Act amendments was to "simplif[y] the

fee structure to a flat, $5.60 fee per one-way trip, regardless of the number of

enplanements."  H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget

---

[1] That understanding of the one-way trip is consistent with the Montreal Convention of 1999, which governs airline liability for "international carriage."  The Montreal Convention defines "international carriage" as "any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, *whether or not there is a break in the carriage* or a transshipment, are situated [] within the territories of two States Parties."  Montreal Convention 1999, Chapter 1, Article 1 § 2 (emphasis added), *available at* http://www.iata.org/policy/Documents/MC99_en.pdf.  That is, a tail-end connecting flight of a one-way trip originating in a foreign country is considered part of the "international carriage" for purposes of the Montreal Convention's liability rules. *See id.* § 3 (providing that an international itinerary "does not lose its international character merely because one contract or a series of contracts is to be performed entirely within the territory of the same State").  It would be rather anomalous for the tail-end segment be part of the "international carriage" under the Montreal Convention yet simultaneously be deemed to "originate at an airport in the United States" under 49 U.S.C. § 44940(c)(1).

Act of 2013, at 18 (Comm. Print Feb. 2014) (Add. 8a).  Applying a security fee to some, but not all, one-way trips that originate in foreign countries would directly undermine Congress' core policy goal of simplifying administration of the fee.

Under the Budget Act amendments, administration of the security fee should be clear, straightforward, and uniform.  One-way trips are the focus of the inquiry, and TSA may impose a $5.60 fee on domestic one-way trips and outbound international trips, but no fee may be imposed on inbound one-way trips that originate in foreign countries.  TSA's interpretation of the statute, in contrast, injects unwarranted complexity into this scheme, providing that one-way trips originating in foreign countries will be treated differently based on the happenstance of whether the passenger's itinerary includes a connecting flight.  That interpretation will directly undermine *both* of Congress' goals in the 2013 amendments:  it will make the fee regime far more complex, and will also reintroduce the concept of "enplanements," which Congress expressly intended to abolish.

Indeed, TSA's mistaken Rule reintroduces for one-way trips originating abroad one of the very anomalies its simplified one-way-trip approach eliminated.  Under the enplanement-based regime, two travelers flying from New York to Los Angeles could pay different fees based on the happenstance of whether they flew non-stop or via a connecting flight.  The non-stop traveler would pay only $2.50, and the traveler with a connection would pay $5.00.  Congress eliminated that

23

anomaly by imposing a single $5.60 fee on every one-way trip.  But TSA's approach reintroduces that differential treatment for one-way trips originating abroad.  A traveler with a direct flight from London to Chicago pays no fee because the one-way trip originates abroad.  But a traveler with a connection in New York pays $5.60 even though the one-way trip originates abroad.

*  *  *

In sum, TSA's collection of security fees for the tail-end domestic segments of trips originating in foreign countries would have made sense under the original version of the statute when the focus was on enplanements.  But it is a wholly untenable interpretation of the amended statutory language, which now focuses on *one-way trips* and where passengers' *one-way trips* originate.  TSA's Rule conflicts with Congress' current approach as reflected in the statutory text.  It is both arbitrary and capricious and contrary to law, and requires the Interim Final Rule to be set aside.

### B.    TSA's Brief Defense of its Imposition of Fees on Domestic Segments of One-way Trips Originating Abroad Does Not Withstand Scrutiny.

Despite the seemingly clear language of 49 U.S.C. § 44940(c), the Interim Final Rule disregards the Budget Act's explicit limitations and seeks to impose a fee on the tail-end domestic segments of one-way trips originating in foreign countries. *See* 79 Fed. Reg. at 35,465 (JA 52).  That policy will allow TSA to saddle the

traveling public with tens of millions of dollars of fees each year, yet TSA spends a mere two paragraphs attempting to justify it.

As noted, TSA does not advance any theory for how a London-to-New York-to-Chicago one-way trip actually originates somewhere other than London. TSA's own regulatory definition of "one-way trip" forecloses any such effort. *See* 79 Fed. Reg. at 35,464-65 (JA 51-52) (defining "one-way trip" as "continuous air transportation, during which a stopover does not occur," and defining "stopover" as a break in travel of more than 12 hours for an international flight). Indeed, TSA's brief discussion of this issue does not even cite the text of section 44940(c), much less attempt to explain how the relevant provisions of the Interim Final Rule can be squared with that provision or the physical reality that a one-way trip originating in London does not also originate in the United States. Nor does TSA point to anything in the legislative history of the Budget Act suggesting that Congress intended for security fees to be imposed on connecting segments of trips that originated in foreign countries.

Instead, TSA attempts to take refuge in a *different* provision of the statute. TSA relies heavily on 49 U.S.C. § 44940(a)(1), entitled "GENERAL AUTHORITY," which provides that TSA "shall impose a uniform fee, on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States" to offset the costs of

25

providing security services.  According to TSA, "if there is covered air transportation at any point in the trip (in other words, any portion of the itinerary includes air transportation originating at an airport in the United States), TSA has authority to impose the fee."  79 Fed. Reg. at 35,465 (JA 52).  TSA thus claims that it has authority to impose fees on all one-way trips that include a domestic enplanement, "*regardless of where the passenger began his or her travel*."  *Id.*  (emphasis added).

TSA's argument disregards one of the most fundamental principles of statutory interpretation—namely, that general provisions of a statute must be construed in light of more-specific provisions elsewhere in the statute.  The Supreme Court has long held that "[h]owever inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment.'"  *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 107 (1944) (quoting *Ginsberg & Sons*, 285 U.S. at 208).  In other words, "'[s]pecific terms prevail over the general in the same or another statute which otherwise might be controlling.'"  *Id.*; *see also RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (detailed and specific statutory provisions "could not be avoided by relying upon a general provision of the Act").

Indeed, this Court has emphasized that an agency "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of [the agency] in a particular area."

26

*American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995). That is, an agency's "broad grant of regulatory authority" cannot trump other "specific provisions of the Act" that limit the agency's authority. *NRDC v. Reilly*, 976 F.2d 36, 41 (D.C. Cir. 1992).

That rule applies with full force here. The broad grant of "GENERAL AUTHORITY" in section 44940(a)(1) must be construed in light of the more-specific language of section 44940(c). Indeed, section 44940(c) is expressly entitled "LIMITATION ON FEE," thus making clear beyond cavil that Congress intended that provision to *limit* TSA's general authority to impose security fees. TSA self-evidently cannot rely on section 44940(a)(1) to justify imposition of a fee that would be prohibited by section 44940(c). Thus, even if a passenger's itinerary includes "air transportation … originating at airports in the United States" for purposes of section 44940(a)(1), TSA may not impose a security fee on that itinerary unless the fee also complies with the express limitations in section 44940(c). As explained above, a one-way trip that originates in a foreign country is simply not a "one-way trip … that originates at an airport in the United States" under section 44940(c). Nothing in section 44940(a)(1) gives TSA license to evade that clear statutory language.

Moreover, TSA's interpretation of its authority under section 44940(a)(1) largely disregards that subsection's authorization for TSA to impose a "uniform fee"

27

on air passengers.  There is nothing "uniform" about TSA's selective use of section 44940(a)(1) as a gap-filler to provide statutory authority that is limited under section 44940(c).   To the contrary, TSA's interpretation creates a dynamic where two passengers whose one-way trips both originate in London are treated disparately based on itinerary differences having nothing to do with where their one-way trips originated.   A traveler without a final domestic leg completes a one-way trip originating in London and pays no fee.  Another traveler also has a one-way trip originating in London (which is all that matters under the Budget Act) but nonetheless pays a fee because TSA treats the final leg as "air transportation" originating in the United States under section 44940(a)(1).  The result is not uniform treatment, but an awkward effort to force a square peg into a round hole.

Indeed, TSA's interpretation of the general grant of authority in section 44940(a)(1) proves far too much, and would render the specific limitations in section 44940(c) largely illusory.   According to TSA, section 44940(a)(1) makes "no distinction between segments and trips," and allows TSA to impose a fee on *any* portion of a trip that involves "'air transportation … originating at airports in the United States.'"  79 Fed. Reg. at 35,465 (JA 52).  But if that interpretation were correct, then TSA would have to apply the fee to every single enplanement at an airport in the United States, including connecting segments of purely *domestic* one-way trips.

28

In other words, TSA's interpretation of section 44940(a)(1) would revive the concept of "enplanements," despite Congress' explicit disavowal of that doctrine in the Budget Act amendments.  Worse still, TSA's interpretation would allow it to easily evade the $5.60-per-one-way-trip limitation on fees.  If a domestic one-way trip included one or more connecting flights, TSA could classify *each flight segment* as "air transportation … originating at airports in the United States," and could impose a separate $5.60 fee on each segment.  TSA apparently concedes that section 44940(c) caps the total fee for a domestic one-way trip at $5.60, regardless of the number of connecting flights, *see* 79 Fed. Reg. at 35,466, Example 2 (Washington Dulles to Los Angeles) (JA 53), but TSA's legal theory about the meaning of section 44940(a)(1) would give the agency carte blanche to circumvent that express statutory limitation.

But while TSA's reading of section 44940(a)(1) would wholly undermine section 44940(c)'s limitation and Congress' shift from enplanements to one-way trips, the plain-text reading allows both provisions to operate in harmony.  Section 44940(a)(1) provides general authority to impose a "uniform fee, on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States" to offset the costs of providing security services.  Section 44940(c) then limits that authority by explaining how Congress determines whether a particular trip involves

"transportation originating at airports in the United States." The critical factor under section 44940(c) is where the one-way trip—not the segment, the enplanement or any other unit of transportation—originates. In short, there is no inherent conflict between the two provisions, but consistent with cardinal principles of statutory construction, the specific most definitely controls the general.

Finally, TSA notes that it has imposed a fee on the tail-end segment of one-way trips that originate outside the United States "consistently since the current regulations took effect in 2002." 79 Fed. Reg. at 35,465 (JA 52). But that appeal to past practice is badly misplaced when Congress has *expressly changed* the statutory language under which the regulations were promulgated. Again, TSA's approach might have made sense when the statute was phrased in terms of "enplanement[s] … that originate[] at an airport in the United States," 49 U.S.C. § 44940(c) (2009), but it simply cannot be squared with the amended statute's focus on "one-way trip[s] … that originate[] at an airport in the United States," 49 U.S.C. § 44940(c).

## II.   TSA's Elimination Of The Round-Trip Cap On Security Fees Is Arbitrary, Capricious, And Contrary To Law.

Claiming only to "implement" the Budget Act, TSA's Interim Final Rule also eliminates the longstanding cap on fees for round-trip itineraries. 79 Fed. Reg. at 35,465-66 (JA 52-53); *see also* Letter from John Pistole, Administrator, TSA, to Nicholas Calio, President, Airlines for America (May 19, 2014) (JA 33). But far from implementing the Budget Act, TSA's decision to abandon more than a decade

30

of settled regulatory practice subverts demonstrable legislative intent and is contrary to common sense, any realistic assessment of Congress' carefully targeted amendments to the Fee, and standard rules of statutory construction. When Congress simplified the fee structure by limiting application of the fee to $5.60 per one-way trip, it made very specific changes to the statute that presupposed the continued existence of other limitations on the fee, including the round-trip cap, and Congress unquestionably intended that the round-trip cap be retained.

### A.    Congress Unquestionably Intended To Retain the Round-Trip Cap on Security Fees.

**1**.    TSA's proposed interpretation of the Budget Act flies in the face of Congress' clear intent to preserve the round-trip cap. When Congress simplified the administration of the fee, it did so assuming that the round-trip cap would remain in place, and based on that assumption made narrow changes to the fee designed to limit its application per one-way trip.

Indeed, the drafters of the Budget Act *stated on the record* precisely what the legislation was intended to accomplish, and that narrow objective presupposed the continued existence of the round-trip cap. The Committee Print of the legislation, for example, states that Congress' intent was to "simplif[y] the fee structure to a flat, $5.60 fee per one-way trip, regardless of the number of enplanements." H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget Act of 2013, at 18 (Comm. Print Feb. 2014) (Add. 8a).

Congress made this narrowly-tailored amendment to the statute against the backdrop of the existing cap on the fee for a round-trip that was premised on the statutory cap of $5.00 per one-way trip.  The Budget Act did not vitiate the one-way trip cap.  To the contrary, it did the one-way cap one better by saying that every one-way trip—without regard to the number of enplanements—would result in a $5.60 fee.  By reinforcing that all one-way trips would result in a $5.60 fee, the last thing Congress intended was to eliminate the round-trip cap, which had always been based on a simple doubling of the statutory one-way cap.  The only impact on the round-trip cap that Congress intended was to raise the cap from $10.00 to $11.20.

Indeed, TSA's elimination of the round-trip cap will directly undermine Congress' express policy goal of *simplifying* administration of the fee.  With a round-trip cap, the calculation of the fee is straightforward—if an itinerary originating in the United States starts in one city and ends in another, the fee is $5.60, and if the itinerary begins and ends in the same United States city, the fee is $11.20.  This treatment mirrors the treatment of one-way trips and round-trips under the pre-existing regime with one important simplifying change—the number of enplanements no longer matters.  But elimination of the cap introduces unintended complexity by raising a number of issues about how to calculate the fee on complex itineraries that include a number of segments, stopovers, and one-way trips.  *See* 79 Fed. Reg. at 35,466, Table 1 (JA 53) (discussing complicated itineraries that involve

32

five or six enplanements).  That complexity increases the compliance burden on the industry and contravenes Congress' goal of simplifying—not complicating—the structure of the fee.

**2**.   Indeed, if there were any doubt that Congress intended to preserve the round-trip cap, the authors of the bipartisan legislation in the House and Senate have dispelled it explicitly.   The members of Congress responsible for drafting the revisions underscored that "Congressional intent … was to retain an overall roundtrip fee cap."  Letter from Congressman Paul Ryan and Senator Patty Murray to Director Sylvia Burwell, OMB (May 30, 2014) (JA 42).  The authors confirm what the congressional record already makes clear—namely, that Congress' "intent in drafting this provision was to help the federal government recover a greater share of TSA's operating costs, consistent with the manner in which the fee had operated previously, i.e. with a cap on a round-trip that was twice the maximum one-way fee." Letter from Congressman Paul Ryan and Senator Patty Murray to John Pistole, Administrator, TSA (May 6, 2014) (JA 31-32).  Accordingly, the drafters note that "[t]here is nothing about the language modification that reflects an indication to change the overall cap for air transportation fees," and that "[i]t is inaccurate to cite Congressional intent through the [Budget Act] as a basis for changes to the definition of a roundtrip."  *Id*.

33

Leaders and committee chairmen from the House and Senate from both political parties have also reiterated that Congress' intent was to "simplify[] the administration of air transportation fees without changing the overall cap for the fees." Letter from John A. Boehner to Jeh Johnson (May 20, 2014) (JA 37). Quite simply, Congress intended "to simplify the fee assessment and logically cap the fee for a round trip at twice that of a one-way trip (i.e. $11.20), as has been TSA's long-held policy." Letter from Chairmen and Ranking Members of the House Committee on Homeland Security to Acting Director Brian Deese, OMB (June 16, 2014) (JA 46); *see also id.* ("TSA's proposed implementation is both inconsistent with TSA's own longstanding rules and contrary to Congressional intent"); Letter from Senator John D. Rockefeller, Chairman, Committee on Commerce, Science, and Transportation, to Acting Director Brian Deese, OMB (June 9, 2014) (JA 43) ("I hope you will respect the original intent which both Chairmen Murray and Ryan have voiced and retain the round-trip cap on TSA fees for air travelers."). And other members of Congress have confirmed that this was their intention as well when they voted to amend the security fee statute. *See, e.g.*, Letter from Congressman Kenny Marchant to Secretary Jeh Johnson, DHS, and Administrator John Pistole, TSA (May 22, 2014) (JA 40).[2]

---

[2] Further confirming that the Interim Final Rule flouts Congress' intent, the House recently voted *423 to 0* to approve a bill that would require TSA to reinstate the

**B.    TSA's Reasons for Eliminating the Round-Trip Cap Disregard Clear Congressional Intent and Are Wholly Without Merit.**

Contrary to established rules of statutory construction, TSA's suggested reading of section 44940(c) gives no weight to the longstanding regulatory backdrop of the round-trip cap or to Congress' clear intent to preserve the cap.  In support of its elimination of the cap, TSA relies principally on a purported plain-text reading of section 44940(c), stating that "in the absence of statutory language authorizing such a cap … this [Rule] does not include a limit on the number of one-way trips that can be charged per itinerary."  79 Fed. Reg. at 35,466 (JA 53); *see also* Letter from John Pistole, Administrator, TSA, to Nicholas Calio, President, Airlines for America (May 19, 2014) (JA 33) ("the statutory language of the [Budget Act] does not provide for a round trip limitation").

One problem with TSA's assertion that the Budget Act does not contain express "statutory language authorizing such a cap" is that the fee provisions never expressly addressed a round-trip cap.  Rather, the round-trip cap followed directly from Congress' imposition of a one-way cap on fees.  When Congress provided a one-way cap of $5.00, it implicitly provided for a round-trip cap of $10.00.  Thus,

---

round-trip cap.  *See* H.R. 5462, 113th Cong. 2d Sess. (passed Sept. 17, 2014) (providing that "[f]ees imposed under subsection (a)(1) shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States, except that the fee imposed per round trip shall not exceed $11.20").

when Congress simplified the statute and strengthened the one-way limit by converting it into a simple one-size-fits-all fee for one-way trips, the last thing Congress expected to happen was to have the round-trip cap disappear.

The broader problem with TSA's argument is that it ignores one of the first principles of statutory construction. As the Supreme Court recently underscored, "[p]art of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions." *Bond v. U.S.*, 134 S.Ct. 2077, 2088 (2014) (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991)). One such presumption is that Congress is presumed to understand, and legislate against, the backdrop of existing law. *See, e.g., Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 169 (2004) ("We can assume Congress legislated against [the relevant] background of law, scholarship, and history"); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 554 (1995) ("Congress is presumed to know the law"); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 698-99 (1979) (same); *Livadas v. Bradshaw*, 512 U.S. 107, 123 n.17 (1994) ("Congress is understood to have legislated against a backdrop of generally applicable labor standards."); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) (Congress presumed to legislate against backdrop of well-established common law principles).

In other words, "[t]he notion that some things 'go without saying' applies to legislation just as it does to everyday life." *Bond*, 134 S. Ct. at 2088. Here, it "go[es]

36

without saying" that when Congress made a carefully targeted change to one discrete aspect of the passenger fee regime—shifting the focus from enplanements to one-way trips—it legislated against the backdrop of the existing round-trip cap. That presumption is especially warranted here, where Congress actually *stated on the record* precisely what it intended to accomplish, and that narrow objective plainly presupposed the continued validity of the round-trip cap. *See* H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget Act of 2013, at 18 (Comm. Print Feb. 2014) (Add. 8a) ("Section 601 simplifies the fee structure to a flat, $5.60 fee per one-way trip, regardless of the number of enplanements.").

TSA's interpretation repudiates clear legislative intent, and is contrary to both established interpretive presumptions and any realistic assessment of Congress' amendments to the fee. These amendments presupposed and built upon the round-trip cap, which reflected the statutory one-way cap that Congress simplified and strengthened. It is simply not plausible that Congress' carefully targeted changes to the statute were intended to upset that settled regulatory understanding *sub silentio*. *See, e.g., Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

TSA also maintains that a round-trip cap is inconsistent with section 44940(a)'s requirement that TSA impose a "uniform fee," because the cap may result in lower fees for passengers who book their flights on one itinerary and higher fees

37

for passengers who take the same flights but do not purchase their travel as part of a single round-trip itinerary.   79 Fed. Reg. at 35,466 (JA 53); *see also* 49 U.S.C. § 44940(a)(1) (mandating that TSA "shall impose a uniform fee, on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States").   But TSA has supplied no reasoning in support of its interpretation of a "uniform fee," nor does it identify anything in the Aviation and Transportation Security Act or the legislative history suggesting that the round-trip cap is inconsistent with the "uniform fee" requirement. *See* Aviation and Transportation Security Act, Conference Report, H.R. Rep. No. 107-296, at 30 (2001).

*   *   *

Congress amended section 44940(c) so that a $5.60 fee would apply per one-way trip that originates in the United States, to be assessed no more than twice per round-trip.   The plain language of the Budget Act mandates this limitation on the fee, and Congress' clear intent was to apply the fee no more than twice per round-trip.   But TSA's Interim Final Rule flips the Budget Act on its head.   TSA reads *out* of the amendment the clear limit on its authority to impose the fee, and reads *in* to the amendment the authority to impose unlimited fees on round-trip flights.   TSA may not pick and choose when it decides to honor the plain meaning of the

38

amendments to 44940(c).  The Interim Final Rule is contrary to law and must be set aside.

## CONCLUSION

The Court should grant the petition for review and remand for further proceedings.

Respectfully submitted,

s/Paul D. Clement

DAVID A. BERG
AIRLINES FOR AMERICA
1301 Pennsylvania Avenue, NW
Suite 1100
Washington, DC 20004
(202) 626-4000

JEFFREY N. SHANE
INTERNATIONAL AIR
TRANSPORT ASSOCIATION
800 Place Victoria, P.O. Box 113
Montreal, QC H4Z 1M1
Canada

PAUL D. CLEMENT
JEFFREY M. HARRIS
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Petitioners*

September 26, 2014

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(N) and the briefing order issued on August 27, 2014 because it contains 9,438 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

Dated: September 26, 2014

s/William R. Levi
William R. Levi

# Addendum

# TABLE OF CONTENTS

49 U.S.C. § 44940 (2014) ...................................................................................1a

Bipartisan Budget Act of 2013, Pub. L. No. 113-67, 127 Stat. 1165, § 601 ...........6a

H. Comm. on the Budget, 113th Cong., Rep. on Bipartisan Budget Act of 2013, (Comm. Print Feb. 2014) .........................................................................8a

49 U.S.C. § 44940 (2010) ...................................................................................9a

49 C.F.R. § 1510.3 (2011) ................................................................................14a

49 C.F.R. § 1510.5 (2011) ................................................................................16a

## 49 U.S.C. § 44940 (2014)

(a) GENERAL AUTHORITY.—

(1) PASSENGER FEES.—The Under Secretary of Transportation for Security shall impose a uniform fee, on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States, to pay for the following costs of providing civil aviation security services:

(A) Salary, benefits, overtime, retirement and other costs of screening personnel, their supervisors and managers, and Federal law enforcement personnel deployed at airport security screening locations under section 44901.

(B) The costs of training personnel described in subparagraph (A), and the acquisition, operation, and maintenance of equipment used by such personnel.

(C) The costs of performing background investigations of personnel described in subparagraphs (A), (D), (F), and (G).

(D) The costs of the Federal air marshals program.

(E) The costs of performing civil aviation security research and development under this title.

(F) The costs of Federal Security Managers under section 44903.

(G) The costs of deploying Federal law enforcement personnel pursuant to section 44903(h).

(H) The costs of security-related capital improvements at airports.

(I) The costs of training pilots and flight attendants under sections 44918 and 44921.

The amount of such costs shall be determined by the Under Secretary and shall not be subject to judicial review. For purposes of subparagraph (A), the term "Federal law enforcement personnel" includes State and local law enforcement officers who are deputized under section 44922.

(2) AIR CARRIER FEES.—

(A) AUTHORITY.—In addition to the fee imposed pursuant to paragraph (1), and only to the extent that the Under Secretary estimates that such fee will be insufficient to pay for the costs of

providing civil aviation security services described in paragraph (1), the Under Secretary may impose a fee on air carriers and foreign air carriers engaged in air transportation and intrastate air transportation to pay for the difference between any such costs and the amount collected from such fee, as estimated by the Under Secretary at the beginning of each fiscal year. The estimates of the Under Secretary under this subparagraph are not subject to judicial review except for estimates and additional collections made pursuant to the appropriation for Aviation Security in Public Law 108-334: Provided, That such judicial review shall be pursuant to section 46110 of title 49, United States Code: Provided further, That such judicial review shall be limited only to additional amounts collected by the Secretary before October 1, 2007.

(B) LIMITATIONS.—

(i) Overall limit.—The amounts of fees collected under this paragraph for each fiscal year may not exceed, in the aggregate, the amounts paid in calendar year 2000 by carriers described in subparagraph (A) for screening passengers and property, as determined by the Under Secretary.

(ii) Per-carrier limit.—The amount of fees collected under this paragraph from an air carrier described in subparagraph (A) for each of fiscal years 2002, 2003, and 2004 may not exceed the amount paid in calendar year 2000 by that carrier for screening passengers and property, as determined by the Under Secretary.

(iii) Adjustment of per-carrier limit.—For fiscal year 2005 and subsequent fiscal years, the per-carrier limitation under clause (ii) may be determined by the Under Secretary on the basis of market share or any other appropriate measure in lieu of actual screening costs in calendar year 2000.

(iv) Finality of determinations.—Determinations of the Under Secretary under this subparagraph are not subject to judicial review except for estimates and additional collections made pursuant to the appropriation

for Aviation Security in Public Law 108-334: Provided, That such judicial review shall be pursuant to section 46110 of title 49, United States Code: Provided further, That such judicial review shall be limited only to additional amounts collected by the Secretary before October 1, 2007.

(C) SPECIAL RULE FOR FISCAL YEAR 2002.—The amount of fees collected under this paragraph from any carrier for fiscal year 2002 may not exceed the amounts paid by that carrier for screening passengers and property for a period of time in calendar year 2000 proportionate to the period of time in fiscal year 2002 during which fees are collected under this paragraph.

(b) SCHEDULE OF FEES.—In imposing fees under subsection (a), the Under Secretary shall ensure that the fees are reasonably related to the Transportation Security Administration's costs of providing services rendered.

(c) LIMITATION ON FEE.—Fees imposed under subsection (a)(1) shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States.

(d) IMPOSITION OF FEE.—

(1) IN GENERAL.—Notwithstanding section 9701 of title 31 and the procedural requirements of section 553 of title 5, the Under Secretary shall impose the fee under subsection (a)(1), and may impose a fee under subsection (a)(2), through the publication of notice of such fee in the Federal Register and begin collection of the fee within 60 days of the date of enactment of this Act, or as soon as possible thereafter.

(2) SPECIAL RULES PASSENGER FEES.—A fee imposed under subsection (a)(1) through the procedures under subsection (d) shall apply only to tickets sold after the date on which such fee is imposed. If a fee imposed under subsection (a)(1) through the procedures under subsection (d) on transportation of a passenger of a carrier described in subsection (a)(1) is not collected from the passenger, the amount of the fee shall be paid by the carrier.

(3) SUBSEQUENT MODIFICATION OF FEE.—After imposing a fee in accordance with paragraph (1), the Under Secretary may modify, from time to time through publication of notice in the Federal Register, the imposition or collection of such fee, or both.

(4) LIMITATION ON COLLECTION.—No fee may be collected under this section, other than subsection (i), except to the extent that the expenditure of the fee to pay the costs of activities and services for which the fee is imposed is provided for in advance in an appropriations Act or in section 44923.

(e) ADMINISTRATION OF FEES.—

(1) FEES PAYABLE TO UNDER SECRETARY.—All fees imposed and amounts collected under this section are payable to the Under Secretary.

(2) FEES COLLECTED BY AIR CARRIER.—A fee imposed under subsection (a)(1) shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation described in subsection (a)(1).

(3) DUE DATE FOR REMITTANCE.—A fee collected under this section shall be remitted on the last day of each calendar month by the carrier collecting the fee. The amount to be remitted shall be for the calendar month preceding the calendar month in which the remittance is made.

(4) INFORMATION.—The Under Secretary may require the provision of such information as the Under Secretary decides is necessary to verify that fees have been collected and remitted at the proper times and in the proper amounts.

(5) FEE NOT SUBJECT TO TAX.—For purposes of section 4261 of the Internal Revenue Code of 1986 (26 U.S.C. 4261), a fee imposed under this section shall not be considered to be part of the amount paid for taxable transportation.

(6) COST OF COLLECTING FEE.—No portion of the fee collected under this section may be retained by the air carrier or foreign air carrier for the costs of collecting, handling, or remitting the fee except for interest accruing to the carrier after collection and before remittance.

(f) Receipts credited as offsetting collections.—Notwithstanding section 3302 of title 31, any fee collected under this section—

(1) shall be credited as offsetting collections to the account that finances the activities and services for which the fee is imposed;

(2) shall be available for expenditure only to pay the costs of activities and services for which the fee is imposed; and

(3) shall remain available until expended.

(g) REFUNDS.—The Under Secretary may refund any fee paid by mistake or any amount paid in excess of that required.

(h) EXEMPTIONS.—The Under Secretary may exempt from the passenger fee imposed under subsection (a)(1) any passenger enplaning at an airport in the

4a

United States that does not receive screening services under section 44901 for that segment of the trip for which the passenger does not receive screening.

(i) DEPOSIT OF RECEIPTS IN GENERAL FUND.—

(1) IN GENERAL.—Beginning in fiscal year 2014, out of fees received in a fiscal year under subsection (a)(1), after amounts are made available in the fiscal year under section 44923(h), the next funds derived from such fees in the fiscal year, in the amount specified for the fiscal year in paragraph (4), shall be credited as offsetting receipts and deposited in the general fund of the Treasury.

(2) FEE LEVELS.—The Secretary of Homeland Security shall impose the fee authorized by subsection (a)(1) so as to collect in a fiscal year at least the amount specified in paragraph (4) for the fiscal year for making deposits under paragraph (1).

(3) RELATIONSHIP TO OTHER PROVISIONS.—Subsections (b) and (f) shall not apply to amounts to be used for making deposits under this subsection.

(4) FISCAL YEAR AMOUNTS.—For purposes of paragraphs (1) and (2), the fiscal year amounts are as follows:

(A) $390,000,000 for fiscal year 2014.

(B) $1,190,000,000 for fiscal year 2015.

(C) $1,250,000,000 for fiscal year 2016.

(D) $1,280,000,000 for fiscal year 2017.

(E) $1,320,000,000 for fiscal year 2018.

(F) $1,360,000,000 for fiscal year 2019.

(G) $1,400,000,000 for fiscal year 2020.

(H) $1,440,000,000 for fiscal year 2021.

(I) $1,480,000,000 for fiscal year 2022.

(J) $1,520,000,000 for fiscal year 2023.

## BIPARTISAN BUDGET ACT OF 2013

SEC. 601. AVIATION SECURITY SERVICE FEES.

(a) AIR CARRIER FEES.—

(1) REPEAL.—Section 44940(a)(2) of title 49, United States Code, is repealed.

(2) CONFORMING AMENDMENT.—Section 44940(d)(1) of such title is amended by striking ", and may impose a fee under subsection (a)(2),".

(3) EFFECTIVE DATE.—The repeal made by paragraph (1) and the amendment made by paragraph (2) shall each take effect on October 1, 2014.

(b) RESTRUCTURING OF PASSENGER FEE.—Section 44940(c) of such title is amended to read as follows:

"(c) LIMITATION ON FEE.—Fees imposed under subsection (a)(1) shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States.".

(c) DEPOSIT OF RECEIPTS IN GENERAL FUND.—Section 44940(i) of such title is amended to read as follows:

"(i) DEPOSIT OF RECEIPTS IN GENERAL FUND.—

"(1) IN GENERAL.—Beginning in fiscal year 2014, out of fees received in a fiscal year under subsection (a)(1), after amounts are made available in the fiscal year under section 44923(h), the next funds derived from such fees in the fiscal year, in the amount specified for the fiscal year in paragraph (4), shall be credited as offsetting receipts and deposited in the general fund of the Treasury.

"(2) FEE LEVELS.—The Secretary of Homeland Security shall impose the fee authorized by subsection (a)(1) so as to collect in a fiscal year at least the amount specified in paragraph (4) for the fiscal year for making deposits under paragraph (1).

"(3) RELATIONSHIP TO OTHER PROVISIONS.—Subsections (b) and (f) shall not apply to amounts to be used for making deposits under this subsection.

"(4) FISCAL YEAR AMOUNTS.—For purposes of paragraphs (1) and (2), the fiscal year amounts are as follows:

"(A) $390,000,000 for fiscal year 2014.

"(B) $1,190,000,000 for fiscal year 2015.

"(C) $1,250,000,000 for fiscal year 2016.

"(D) $1,280,000,000 for fiscal year 2017.

"(E) $1,320,000,000 for fiscal year 2018.

"(F) $1,360,000,000 for fiscal year 2019.

"(G) $1,400,000,000 for fiscal year 2020.

"(H) $1,440,000,000 for fiscal year 2021.

"(I) $1,480,000,000 for fiscal year 2022.

"(J) $1,520,000,000 for fiscal year 2023.".

(d) IMPOSITION OF FEE INCREASE.—The Secretary of Homeland Security shall implement the fee increase authorized by the amendment made by subsection (b)—

(1) beginning on July 1, 2014; and

(2) through the publication of notice of such fee in the Federal Register, notwithstanding section 9701 of title 31, United States Code, and the procedural requirements of section 553 of title 5, United States Code.

(e) CONTINUED AVAILABILITY OF EXISTING BALANCES.—The amendments made by this section shall not affect the availability of funds made available under section 44940(i) of title 49, United States Code, before the date of enactment of this Act.

## BIPARTISAN BUDGET ACT OF 2013
## COMMITTEE PRINT OF THE COMMITTEE ON THE BUDGET

*Sec. 601. Aviation security service fees.*

Prior to September 11, 2001, airlines paid for and carried out passenger and baggage security screening. With the formation of the Transportation Security Administration (TSA) came a mandate to substantially increase and coordinate aviation security procedures, and TSA screeners were deployed to airports across the country. To offset the cost of aviation security operations, the Aviation and Transportation Security Act instituted aviation passenger security fees, which were to cover the costs of security operations including technology, salaries and benefits of screeners, the air marshals program, Federal Security Managers, capital improvements, and other functions. TSA receives approximately $2 billion a year in offsetting collections under current law through air carrier and aviation passenger security fees. These fees cover about 30 percent of the agency's aviation security costs.

The aviation passenger security fee was initially established at a charge of $2.50 per enplanement with a maximum one-way trip fee of $5.00 (a passenger taking a non-stop flight paid a total of $2.50, while a passenger with at least one connecting flight paid $5.00).

Section 601 simplifies the fee structure to a flat, $5.60 fee per one-way trip, regardless of the number of enplanements. It also eliminates the Aviation Infrastructure Security Fee (ASIF) charged to air carriers. This fee structure allows TSA to offset approximately 43 percent of its aviation security costs.

Section 601(a) repeals the ASIF that is currently imposed on air carriers, effective October 1, 2014.

Section 601(b) restructured the aviation passenger security fee to make it a $5.60 per one-way trip charge, which is $.60 above the current maximum fee.

Section 601(c) requires receipts in excess of the $250,000,000 deposited annually into the Aviation Security Capital Fund be deposited in the general fund of the Treasury to partially defray the cost to the taxpayer of providing these services.

Section 601(d) provides that the fee structure shall be changed effective July 1, 2014.

Section 601(e) provides that nothing in this section effects the availability of funds in the Checkpoint Screening Security Fund.

## 49 U.S.C. § 44940 (2010)

(a) GENERAL AUTHORITY.—

(1) PASSENGER FEES.—The Under Secretary of Transportation for Security shall impose a uniform fee, on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States, to pay for the following costs of providing civil aviation security services:

(A) Salary, benefits, overtime, retirement and other costs of screening personnel, their supervisors and managers, and Federal law enforcement personnel deployed at airport security screening locations under section 44901.

(B) The costs of training personnel described in subparagraph (A), and the acquisition, operation, and maintenance of equipment used by such personnel.

(C) The costs of performing background investigations of personnel described in subparagraphs (A), (D), (F), and (G).

(D) The costs of the Federal air marshals program.

(E) The costs of performing civil aviation security research and development under this title.

(F) The costs of Federal Security Managers under section 44903.

(G) The costs of deploying Federal law enforcement personnel pursuant to section 44903(h).

(H) The costs of security-related capital improvements at airports.

(I) The costs of training pilots and flight attendants under sections 44918 and 44921.

The amount of such costs shall be determined by the Under Secretary and shall not be subject to judicial review. For purposes of subparagraph (A), the term "Federal law enforcement personnel" includes State and local law enforcement officers who are deputized under section 44922.

(2) AIR CARRIER FEES.—

(A) AUTHORITY.—In addition to the fee imposed pursuant to paragraph (1), and only to the extent that the Under Secretary estimates that such fee will be insufficient to pay for the costs of

9a

providing civil aviation security services described in paragraph (1), the Under Secretary may impose a fee on air carriers and foreign air carriers engaged in air transportation and intrastate air transportation to pay for the difference between any such costs and the amount collected from such fee, as estimated by the Under Secretary at the beginning of each fiscal year. The estimates of the Under Secretary under this subparagraph are not subject to judicial review except for estimates and additional collections made pursuant to the appropriation for Aviation Security in Public Law 108–334: Provided, That such judicial review shall be pursuant to section 46110 of title 49, United States Code: Provided further, That such judicial review shall be limited only to additional amounts collected by the Secretary before October 1, 2007.

(B) LIMITATIONS.—

(i) OVERALL LIMIT.—The amounts of fees collected under this paragraph for each fiscal year may not exceed, in the aggregate, the amounts paid in calendar year 2000 by carriers described in subparagraph (A) for screening passengers and property, as determined by the Under Secretary.

(ii) PER-CARRIER LIMIT.—The amount of fees collected under this paragraph from an air carrier described in subparagraph (A) for each of fiscal years 2002, 2003, and 2004 may not exceed the amount paid in calendar year 2000 by that carrier for screening passengers and property, as determined by the Under Secretary.

(iii) ADJUSTMENT OF PER-CARRIER LIMIT.—For fiscal year 2005 and subsequent fiscal years, the per-carrier limitation under clause (ii) may be determined by the Under Secretary on the basis of market share or any other appropriate measure in lieu of actual screening costs in calendar year 2000.

(iv) FINALITY OF DETERMINATIONS.—Determinations of the Under Secretary under this subparagraph are not subject to judicial review except for estimates and additional collections made pursuant to the appropriation for Aviation Security in Public Law 108–334: Provided, That such judicial review shall be pursuant to section 46110 of title 49, United States Code: Provided further, That such judicial review shall be limited only

10a

to additional amounts collected by the Secretary before October 1, 2007.

(C) SPECIAL RULE FOR FISCAL YEAR 2002.—The amount of fees collected under this paragraph from any carrier for fiscal year 2002 may not exceed the amounts paid by that carrier for screening passengers and property for a period of time in calendar year 2000 proportionate to the period of time in fiscal year 2002 during which fees are collected under this paragraph.

(b) SCHEDULE OF FEES.—In imposing fees under subsection (a), the Under Secretary shall ensure that the fees are reasonably related to the Transportation Security Administration's costs of providing services rendered.

(c) LIMITATION ON FEE.—Fees imposed under subsection (a)(1) may not exceed $2.50 per enplanement in air transportation or intrastate air transportation that originates at an airport in the United States, except that the total amount of such fees may not exceed $5.00 per one-way trip.

(d) IMPOSITION OF FEE.—

(1) IN GENERAL.—Notwithstanding section 9701 of title 31 and the procedural requirements of section 553 of title 5, the Under Secretary shall impose the fee under subsection (a)(1), and may impose a fee under subsection (a)(2), through the publication of notice of such fee in the Federal Register and begin collection of the fee within 60 days of the date of enactment of this Act, or as soon as possible thereafter.

(2) SPECIAL RULES PASSENGER FEES.—A fee imposed under subsection (a)(1) through the procedures under subsection (d) shall apply only to tickets sold after the date on which such fee is imposed. If a fee imposed under subsection (a)(1) through the procedures under subsection (d) on transportation of a passenger of a carrier described in subsection (a)(1) is not collected from the passenger, the amount of the fee shall be paid by the carrier.

(3) SUBSEQUENT MODIFICATION OF FEE.—After imposing a fee in accordance with paragraph (1), the Under Secretary may modify, from time to time through publication of notice in the Federal Register, the imposition or collection of such fee, or both.

(4) LIMITATION ON COLLECTION.—No fee may be collected under this section, other than subsection (i), except to the extent that the expenditure of the fee to pay the costs of activities and services for which the fee is imposed is provided for in advance in an appropriations Act or in section 44923.

11a

(e) ADMINISTRATION OF FEES.—

    (1) FEES PAYABLE TO UNDER SECRETARY.—All fees imposed and amounts collected under this section are payable to the Under Secretary.

    (2) FEES COLLECTED BY AIR CARRIER.—A fee imposed under subsection (a)(1) shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation described in subsection (a)(1).

    (3) DUE DATE FOR REMITTANCE.—A fee collected under this section shall be remitted on the last day of each calendar month by the carrier collecting the fee. The amount to be remitted shall be for the calendar month preceding the calendar month in which the remittance is made.

    (4) INFORMATION.—The Under Secretary may require the provision of such information as the Under Secretary decides is necessary to verify that fees have been collected and remitted at the proper times and in the proper amounts.

    (5) FEE NOT SUBJECT TO TAX.—For purposes of section 4261 of the Internal Revenue Code of 1986 (26 U.S.C. 4261), a fee imposed under this section shall not be considered to be part of the amount paid for taxable transportation.

    (6) COST OF COLLECTING FEE.—No portion of the fee collected under this section may be retained by the air carrier or foreign air carrier for the costs of collecting, handling, or remitting the fee except for interest accruing to the carrier after collection and before remittance.

(f) Receipts Credited as Offsetting Collections.—Notwithstanding section 3302 of title 31, any fee collected under this section—

    (1) shall be credited as offsetting collections to the account that finances the activities and services for which the fee is imposed;

    (2) shall be available for expenditure only to pay the costs of activities and services for which the fee is imposed; and

    (3) shall remain available until expended.

(g) REFUNDS.—The Under Secretary may refund any fee paid by mistake or any amount paid in excess of that required.

(h) EXEMPTIONS.—The Under Secretary may exempt from the passenger fee imposed under subsection (a)(1) any passenger enplaning at an airport in the United States that does not receive screening services under section 44901 for that segment of the trip for which the passenger does not receive screening.

(i) CHECKPOINT SCREENING SECURITY FUND.—

12a

(1) ESTABLISHMENT.—There is established in the Department of Homeland Security a fund to be known as the "Checkpoint Screening Security Fund".

(2) DEPOSITS.—In fiscal year 2008, after amounts are made available under section 44923(h), the next $250,000,000 derived from fees received under subsection (a)(1) shall be available to be deposited in the Fund.

(3) FEES.—The Secretary of Homeland Security shall impose the fee authorized by subsection (a)(1) so as to collect at least $250,000,000 in fiscal year 2008 for deposit into the Fund.

(4) AVAILABILITY OF AMOUNTS.—Amounts in the Fund shall be available until expended by the Administrator of the Transportation Security Administration for the purchase, deployment, installation, research, and development of equipment to improve the ability of security screening personnel at screening checkpoints to detect explosives.

## 49 C.F.R. § 1510.3 (2011)

The following definitions apply in this part:

*Administrator* means the Administrator of the Transportation Security Administration or the Administrator's designee.

*Air carrier* means a citizen of the United States who undertakes directly to engage in or provide air transportation.

*Air transportation* means intrastate, interstate or foreign air transportation.

*Aircraft* means a device that is used or intended to be used for flight in the air.

*Airport* means any landing area used regularly by aircraft for receiving or discharging passengers or cargo.

*Direct air carrier and foreign air carrier* means a selling carrier.

*Foreign air carrier* means any person other than a citizen of the United States who undertakes directly to engage in or provide air transportation.

*Foreign air transportation* means the carriage by aircraft of persons for compensation or hire between a place in the United States and any place outside of the United States.

*Frequent flyer award* means a zero-fare award of air transportation that a domestic air carrier or foreign air carrier provides to a passenger in exchange for accumulated travel mileage credits in a customer loyalty program, whether or not the term frequent flyer is used in the definition of that program.

*Interstate air transportation* means the carriage by aircraft of persons for compensation or hire within the United States.

*Intrastate air transportation* means the carriage of persons for compensation or hire wholly within the same State of the United States.

14a

*Nonrevenue passenger* means a passenger receiving air transportation from an air carrier or foreign air carrier for which the air carrier or foreign air carrier does not receive remuneration.

*One-way trip* means any trip that is not a round trip.

*Origin point* means the location at which a trip on a complete air travel itinerary begins.

*Passenger enplanement* means a person boarding in the United States in scheduled or nonscheduled service on aircraft in intrastate, interstate, or foreign air transportation.

*Principal* means the aggregate amount of all passenger security services fees due to be remitted to the Transportation Security Administration by an air carrier as required by this part.

*Round trip* means a trip on an air travel itinerary that terminates at the origin point.

*Selling carrier* means an air carrier or foreign air carrier that provides or offers to provide air transportation and has control over the operational functions performed in providing that air transportation.

## 49 C.F.R. § 1510.5 (2011)

Imposition of security service fees.

(a) The security service fee will be $2.50 per passenger enplanement. The security service fee is imposed only on passengers of direct air carriers and foreign air carrier described in § 1510.9(a). Passengers may not be charged for more than two enplanements per one-way trip or four enplanements per round trip.

(b) The security service fee will be imposed on all flight segments originating at an airport in the United States.

(c) The security service fee must be imposed on passengers who obtained the ticket for air transportation with a frequent flyer award, but may not be imposed on any other nonrevenue passengers.

(d) Passengers enplaning a flight segment outside of the United States are not subject to the security service fee for that enplanement.

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2014, I electronically filed the foregoing Opening Brief for Petitioners with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

s/Paul D. Clement
Paul D. Clement